SHERMAN MEALEY

VERSUS                                    CIVIL NO. 16-716-JWD-RLB

SID J. GAUTREAUX, III AND THE
CITY/PARISH OF EAST BATON ROUGE


RULING AND ORDER


This matter is before the Court on a *Motion for Summary Judgment* filed by the City/Parish of East Baton Rouge ("City/Parish"). (Doc. 122.) In response, Sherman Mealey ("Mr. Mealey" or "Plaintiff") filed *Plaintiff's Opposition to the City/Parish's Motion for Summary Judgment* ("*Response to City/Parish*"). (Doc. 148.) Also, before the Court is a *Motion for Summary Judgment* filed by Sheriff Sid J. Gautreaux, III, ("Sheriff"). (Doc. 132.)[1] In response, Plaintiff filed *Plaintiff's Opposition to the Sheriff's Motion for Summary Judgment* ("*Response to Sheriff*"). (Doc. 150.) The Sheriff filed a *Reply Memorandum in Support of Sheriff's Motion for Summary Judgment*. (Doc. 157.) Plaintiff filed a *Sur-Reply in Support of Plaintiff's Opposition Memorandum.* (Doc. 159.) The Court held oral argument on the City/Parish's and the Sheriff's *Motions for Summary Judgment*. Having considered the facts, the arguments raised by the parties, and the law, the Court will

DENY the City/Parish's *Motion for Summary Judgment* (Doc. 122), and

---

[1] The Sheriff's Motion for Summary Judgment was filed twice as Doc. 129 and Doc. 132. Mr. Mealey responded to the Motion for Summary Judgment filed as Doc. 132. The Court is not aware of any meaningful difference between the Sheriff's Motions for Summary Judgment and will rule contemporaneously on both briefs but will only refer to Doc. 132.

DENY IN PART the Sheriff's *Motion for Summary Judgment* (Doc. 132 and Doc. 129) as to the claim against the Sheriff in his official capacity pursuant to the ADA and the RA; and

GRANT IN PART the Sheriff's *Motion for Summary* in part to claim against the Sheriff pursuant to § 1983 in his official capacity.

<u>BACKGROUND AND PROCEDURAL HISTORY</u>

Plaintiff, Mr. Mealey is a paraplegic, who is unable to walk, stand, or use his legs without assistance and requires a wheelchair for his primary means of mobility. (Mealey Dep., Doc. 150-34, at 19:10-12, 30:3-8.) As a paraplegic, Mr. Mealey has a qualified disability under the Americans with Disabilities Act ("ADA"). Mr. Mealey was first incarcerated in 2012 ("2012 Incarceration") at the East Baton Rouge Parish Prison ("Prison"). Mr. Mealey was also incarcerated at the Prison from August 10, 2015 to October 24, 2016 ("2015 Incarceration"). Plaintiff sued the Sheriff and the City/Parish (together, "Defendants") alleging that during his 2015 Incarceration Defendants violated the ADA and the Rehabilitation Act ("RA") as well as his constitutional rights pursuant to § 1983. Plaintiff alleges that due to his paraplegic condition, he requires specific accommodations, and that the City and the Sheriff impermissibly denied his requests for those accommodations. These accommodations include but are not limited to: (1) access to a shower chair; (2) materials to elevate his feet to reduce swelling; (3) catheters to help him urinate; and (4) suppositories to help him defecate. Plaintiff alleges that as a result of the lack of accommodation he has suffered: (a) swollen legs; (b) bedsores and infections; (c) urinary track infections; (d) lack of personal hygiene; (e) personal humiliation, disgrace and embarrassment; (f) invasion of privacy through the unwanted touching by other inmates; (g) sleep deprivation; and (h) invasion of his civil rights.

The Sheriff and the City/Parish are public entities subject to the obligations in the ADA and the RA. As discussed in more detail below, under Louisiana law the Sheriff is the political

entity responsible for keeping and operating the Prison and therefore "seeing to it that the prisoners are properly cared for, fed and clothed." *Amiss v. Dumas*, 411 So. 2d 1137, 1141 (La. 1st Cir. Ct. App. 1982), *writ denied,* 415 So. 2d 940 (La. 1982). Conversely, under Louisiana law the City/Parish owns the prison and is responsible for funding "the expenses of establishing, maintaining and operating the jail and for all the expenses of feeding, clothing, and providing medical treatment to the prisoners." *Id.* During Mr. Mealey's 2015 Incarceration, the City/Parish, acting through the Baton Rouge Metropolitan Council and its Emergency Medical Services Department and the Prison Medical Services Division ("Prison Medical Services"), to provide medical treatment to inmates in the prison. Prison Medical Services began providing treatment following the closure of the Earl K Long Medical Center around 2014. (Doc. 132-6.) For an average daily population of over 1550 inmates, Prison Medical Services employed or contracted with two physicians, a psychiatrist, a mental health nurse practitioner, a dentist and a radiology technician along with nursing staff. (*Id.*) Prison Medical Services operated out of the medical unit within the Prison ("Infirmary"). (*Id.*)

FACTS NOT IN GENUINE DISPUTE[2]

For the purpose of ruling on the summary judgment motions the Court finds the following facts are not in genuine dispute. During Mr. Mealey's 2012 Incarceration at the Prison, Plaintiff learned that there was a shower in the Infirmary, which includes grab bars, a shower seat, and sufficient clear floor space for his wheelchair and to remove the wheelchair to keep it dry. (*Amended Complaint*, Doc. 77 at ¶ 19.) During his 2015 Incarceration, Plaintiff was allowed to shower in the Infirmary shower at times (Mealey Dep., Doc. 150-34 at 84:18-23.) Deputies at the Prison allowed Plaintiff to take showers in the Infirmary when he was housed elsewhere in

---

[2] The Facts Not in Genuine Dispute were compiled by analyzing the facts submitted by the Defendants in support of summary judgment and the Plaintiff's response and facts submitted in opposition of summary judgment.

the Prison. (Mealey Dep., Doc. 150-34 at 85:22-25, 86:1-3.) Some nurses, specifically, Nurse Antoine, would not let Plaintiff use the Infirmary shower. (Mealey Dep., Doc. 150-34 at 76:2-25, 77:1-25, 78:1-14, 87:1-21.) Prison Medical Services was responsible for deciding who could use the shower in the Infirmary. (Warden Grimes Dep., Doc. 150-40 at 42:24-25, 43:1-25, 44:1-4; Beatrice Stines Dep., Doc. 150-33 at 92:12-25, 93:2-12.) While being housed in general population, Plaintiff was always able to place himself in the shower. (Mealey Dep., Doc. 150-34 at 148:4-25, 160:20-25, 161:1-13) Mealey received assistance from fellow inmates near the showers if he asked for assistance. (Mealey Dep., Doc. 150-34 at 149:16-150:14.)

While Warden Grimes was making rounds on the Q building, Mr. Mealey stopped him and told him that he needed a shower chair to shower with, and when asked if there was one on the line, Mr. Mealey told him "no." Warden Grimes told Prison Medical Services that there is a need for shower chairs in the Q building. Warden Grimes did not know whether there were shower chairs in the Infirmary or whether they were broken. Warden Grimes passed the request on to Prison Medical Services because they supplied the shower chairs. (Warden Grimes Dep., Doc. 150-40 at 10:15-25, 11:1-4.) It was Warden Grimes' understanding that there were grab bars in showers in each of the twelve dorms. (Warden Grimes Dep., Doc. 150-40 at 24:1-11.)

Plaintiff understood that Prison Medical Services provided wheelchairs which were kept in the Infirmary. (Mealey Dep., Doc. 150-34 at 230:5-25.) The Prison accepted personal catheters and suppositories from Mealey's family and distributed them to him during morning and evening pill calls ranging from two catheters until next pill call, to an entire box of thirty catheters to be rationed as needed. (Mealey Dep., Doc. 150-34 at 180:10-183:24.) The nurses and not the deputies provided Mealey with catheters at the Prison. (Mealey Dep., Doc. 150-34 at 183, 184, 185, 186.)

During his time at the jail, Mealey was able to make use of his cell area to elevate his feet without any problem, including using the bars, cover (blanket), bunk bed, etc. (Mealey Dep., Doc. 150-34 at 172:20-174:17.) Mealey was told by certain deputies that he could not stick his feet in the bunk, but he never got a nurse's attention to explain to the deputy that elevating his feet was good for his circulation. (Mealey Dep., Doc. 150-34 at 173-175.) In one event, Mealey's feet began to swell to the extent he made a medical request, and he was treated by a physician and the prescribed fluid medication resolved the swelling. (Mealey Dep., Doc. 150-34 at 177:9-178:25.)

Corporal Patrick was employed by the Sheriff to process inmate grievances. (Cpl. Wayne Patrick Dep., Doc. 150-35 at 10:4-23.) As part of Corporal Patrick's job processing grievances, he could reject a grievance for various reasons. (Cpl. Wayne Patrick Dep., Doc. 150-35 at 11:2-14.) For example, Corporal Patrick could reject a grievance if it contained multiple complaints or if it did not affect the inmate at the time he filed his complaint, for instance, when the complaint was moot. (Cpl. Wayne Patrick Dep., Doc. 150-35 at 14:2-25, 15:1-4.) It was ultimately the responsibility of Prison Medical Services to determine whether a grievance related to an inmate's medical needs was founded or unfounded. Prison Medical Services was a separate department from the Sheriff's department. (Cpl. Wayne Patrick Dep., Doc. 150-35 at 20:7-20, 21:1-3.) Corporal Patrick rejected a grievance filed by Plaintiff between October 19 and October 30, 2015 in which Plaintiff asserted that he was on Medical Lockdown and he was requesting that he be moved back to the general population. Plaintiff was also complaining about his wheelchair. (Cpl. Wayne Patrick Dep., Doc. 150-35 at 41:11-25.)

The City/Parish is a public entity covered by Title II of the ADA. The City/Parish received federal funding in 2015 and 2016. (Doc. 148-3.) The City/Parish owns the Prison.

(Gautreaux Aff., Doc. 132-10 at ¶ 5.) The City/Parish is responsible for the expenses of physically maintaining the Prison. (Gautreaux Aff., Doc. 132-10 at ¶¶ 5-6.) The City/Parish is responsible for all of the expenses of feeding, clothing and providing medical care to inmates at the Prison. (Gautreaux Aff., Doc. 132-10 at ¶ 7.) Prison Medical Services was responsible for providing the medical care of the offenders at the Prison. (Doc. 150-38 at I:5:21-24, Doc. 150-39 II:152:19-25, II:153:1-5; Gautreaux Aff., Doc. 132-10 at ¶ 8.)

The Sheriff does not own the Prison. (Gautreaux Aff., Doc. 132-10 at ¶ 5.) The Sheriff did not enter into a contract with Prison Medical Services or Emergency Medical Services Department or any doctor to provide medical services to inmates at the Prison. (Gautreaux Aff., Doc. 132-10 at ¶ 2.) The Sheriff does not choose the providers of medical services to inmates at the Prison. (Gautreaux Aff., Doc. 132-10 at ¶ 3.) The Sheriff has no control over the hiring or firing of Prison Medical Services employees. (Gautreaux Aff., Doc. 132-10 at ¶ 3.) The Sheriff has no control over the staffing levels of Prison Medical Services. (Gautreaux Aff., Doc. 132-10 at ¶¶ 3-4.)

## APPLICABLE STANDARD

Under Rule 56(a), summary judgment is generally appropriate "if the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *Wilson v. Tregre*, 787 F.3d 322, 325 (5th Cir. 2015) (quoting Rule 56(a)). A dispute is "genuine" so long as "the evidence is such that a reasonable jury could return a verdict for the nonmoving party"; a fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986); *see also Ray v. United Parcel Serv.*, 587 F. App'x 182, 186 (5th Cir. 2014) (citing *Anderson*, 477 U.S. at 248). Axiomatically, a court construes all facts and evidence in the light most favorable to the nonmovant. *Haverda v. Hays Cty.*, 723 F.3d 586, 591

(5th Cir. 2013). In response to another's motion, the nonmovant cannot rely on "[c]onclusory allegations, speculation, unsubstantiated assertions, and legalistic arguments," none "an adequate substitute for specific facts showing a genuine issue for trial." *TIG Ins. Co. v. Sedgwick James of Wash.*, 276 F.3d 754, 759 (5th Cir. 2002). Still, "[w]hen both parties have submitted evidence of contradictory facts," *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005), a court is bound to "draw all reasonable inferences in favor of the nonmoving party" and cannot "make credibility determinations or weigh the evidence," *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 150, 120 S. Ct. 2097, 2110, 147 L. Ed. 2d 105 (2000); *see also Anderson*, 477 U.S. at 248 (emphasizing the irrelevance of "[a]ny proof or evidentiary requirements imposed by the substantive law," materiality "not a criterion for evaluating the evidentiary underpinning of [factual disputes]").

Thus, "the court should give credence to the evidence favoring the nonmovant as well as that evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses." 9A C. WRIGHT & A. MILLER, FEDERAL PRACTICE AND PROCEDURE § 2529 (2d ed. 1995). In other words, "although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe." *Reeves*, 530 U.S. at 151, *cited in Havera*, 723 F.3d at 591. If more than a scintilla of evidence is assembled, "[t]he court must resolve factual controversies in favor of the nonmoving party." *White v. Gov't Emps. Ins. Co.*, 457 F. App'x 374, 377 (5th Cir. 2012). Under Rule 56, summary judgment is hence inappropriate (1) if there are legitimate, not superficial or frivolous, factual disputes that may affect the outcome of the case under the applicable substantive law, *see Anderson*, 477 U.S. at 248, and (2) so long as the nonmovant does not exclusively rely on "some metaphysical doubt as to the material facts," "conclusory

allegations," "unsubstantiated" or "bare assertions," or "a scintilla of evidence," *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (citing *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888, 110 S. Ct. 3177, 3188, 111 L. Ed. 2d 695 (1990); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986); *Hopper v. Frank*, 16 F.3d 92, 94 (5th Cir. 1994); and *Davis v. Chevron U.S.A., Inc.*, 14 F.3d 1082, 1086 (5th Cir. 1994)). An alleged "lack of evidence to support the non-moving party's case" can hence be countered by "[s]pecific evidence in the record," such tailored opposition foreclosing summary judgment. *Jobe v. ATR Mktg., Inc.*, No. 98-31366, 1999 U.S. App. LEXIS 40209, at *8–9, 1999 WL 511380, at *3 (5th Cir. June 23, 1999) (citing *Duffy v. Leading Edge Prods., Inc.*, 44 F.3d 308, 312 (5th Cir. 1995), and *ContiCommodity Servs., Inc. v. Ragan*, 63 F.3d 438, 441 (5th Cir. 1995)).

DISCUSSION

*a. The Rehabilitation Act*

1. Parties' arguments

The City/Parish argues that it does not receive federal financial assistance for the Prison and therefore, Mr. Mealey's Rehabilitation Act claim against the City fails as a matter of law. (Doc. 122 at 7.) Plaintiff responds that a claim under the Rehabilitation Act requires a showing that the public entity received federal funds, but not that the federal funds have to be dedicated to the services at issue. (Doc. 148 at 8.) Plaintiff maintains, "By accepting federal funds "as a whole" and then passing some portion of those funds to PMS by operation of the general fund, PMS [Prison Medical Services] received federal funds and was obligated to comply with the Rehabilitation Act." (*Id.* at 38, (citing 29 U.S.C. § 794(b)(1)(B).) Therefore, Plaintiff reasons that because Prison Medical Services is not a financially and administratively independent subunit, any federal funds the City/Parish receives operates as a waiver of sovereign immunity under the Rehabilitation Act. (*Id.*)

2. Substantive law

Section 504 of the Rehabilitation Act states:

> No otherwise qualified individual with a disability in the United States, as defined in section 705(20) of this title, shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

29 U.S.C. § 794(a). The Rehabilitation Act further defines "program or activity" as

> all of the operations of-- (1)(A) a department, agency, special purpose district, or other instrumentality of a State or of a local government; or (B) the entity of such State or local government that distributes such assistance and each such department or agency (and each other State or local government entity) to which the assistance is extended, in the case of assistance to a State or local government; . . . any part of which is extended Federal financial assistance.

29 U.S.C. § 794(b). In applying the Rehabilitation Act, the Fifth Circuit has explained that

> [T]o state a § 504 claim under the Rehabilitation Act, a plaintiff must allege that the specific program or activity with which he or she was involved receives or directly benefits from federal financial assistance. [A] plaintiff may not predicate a § 504 claim against a state actor on the mere fact that the state itself obtains federal money.

*Taylor v. City of Shreveport*, 798 F.3d 276, 283 (5th Cir. 2015) (internal citations omitted) .

Under Louisiana state law, the governing authority of each parish is responsible for the

conditions and maintenance of the prisons being operated by that authority. Louisiana Revised

Statute 15:702 states:

> The governing authority of each parish shall be responsible for the physical maintenance of all parish jails and prisons. In those parishes in which the governing authority operates the parish jail the governing authority shall pass all bylaws and regulations they may deem expedient for the police and good government of the jails and prisons being operated by the parish governing authority.

Further, Louisiana Revised Statute 33:4715 states:

> The police jury of each parish shall provide a good and sufficient court-house, with rooms for jurors, and a good and sufficient jail, at such place as they may deem most convenient for the parish at large, provided that when the seat of justice is established by law, they shall not have power to remove it.

The Louisiana Court of Appeals has interpreted the statutory scheme mandating the parish's responsibility as follows:

> The general scheme which we gather from a reading of all of the statutes is that the City-Parish is responsible for the expenses of establishing, maintaining and operating the jail and for all the expenses of feeding, clothing, and providing medical treatment to the prisoners while the sheriff has the duty of operating the jail and seeing to it that the prisoners are properly cared for, fed and clothed. . . . La. R.S. 15:702 places the responsibility for the physical maintenance of all parish jails and prisons upon the governing authority of each parish. No distinction is made therein between major and minor repairs, major and minor appliances, the general responsibility of the parish governing authority to maintain the prison and the supplies necessary for daily routine maintenance. This statute, along with La. R.S. 33:4715, which requires that the governing authority provide a "good and sufficient jail", mandates that the parish governing authority is responsible for establishing and maintaining the parish prison which includes all equipment and supplies necessary for the establishment and proper maintenance of the jail.

*Amiss v. Dumas*, 411 So. 2d at 1141; *see Arce v. Louisiana*, 226 F. Supp. 3d 643, 649 (E.D. La. 2016) ("[T]he parish does have the responsibility of financing and physically maintaining the jail. It follows that, at the very least, the parish may be held liable when the physical jail facility itself does not comply with federal standards. It is also conceivable that to the extent the jail's deficiencies are attributable solely to a lack of adequate funding, the parish's obligation to fund the jail could be implicated and the parish might be held responsible.")

3. <u>Analysis</u>

It is undisputed that the City/Parish and the Sheriff received federal funds from 2015-2016. The City/Parish argues that because division of Emergency Medical Services that operates as Prison Medical Services did not receive federal funds, the Rehabilitation Act does not apply to the City/Parish's activities in "establishing, maintaining and operating the jail and for all the expenses of feeding, clothing, and providing medical treatment to the prisoners." *Amiss*, 411 So. 2d at 1141. The Court does not agree. Louisiana state law clearly places financial responsibility to maintain the jail and provide funding for all the expenses of feeding, clothing, and providing

medical treatment to the prisoners on the governing board of the City/Parish. The City/Parish cannot escape liability under the Rehabilitation Act by isolating and insulating Prison Medical Services from the overall activities of the City/Parish. Prison Medical Services is the conduit through which the City/Parish accomplishes the particular operation of providing medical treatment to the prisoners, as Louisiana state law requires it to do. Therefore, without evidence that Prison Medical Services is a separate legal entity and not merely the operation of the Baton Rouge Metropolitan Council to accomplish its statutory obligations, the Rehabilitation Act applies. *See Haybarger v. Lawrence Cty. Adult Prob. & Parole*, 551 F.3d 193, 200 (3d Cir. 2008) ("Once the department or agency is identified, however, the statute encompasses all of its operations, regardless of whether a particular operation is federally assisted.")The Court will therefore DENY the City/Parish's *Motion for Summary Judgment* as to the applicability of the Rehabilitation Act.

b. *Lack of reasonable modification under the ADA/RA*

   1. Parties' arguments

      A. *City/Parish's arguments*

The City/Parish argues that Plaintiff's claims under the ADA are "unfounded because he received reasonable accommodations and equal access to the same services (i.e. showers and medical care) authorized for all other inmates in accordance with the Sherriff's Rules and Regulations of the East Baton Rouge Parish Prison." (Doc. 122-3 at 4, (citing Ex. A Dep. Of Warden Dennis Grimes at 30:9-31:3, 79:1-23 and Dep. Ex. 21, 25-29).) The City/Parish states that it provided reasonable accommodation for Mealey because: (1) Mealey had equal and reasonable access to the showers on his assigned cell line and there were shower chairs; (2) the City/Parish had no obligation to provide Mealey with a wheelchair; and (3) Mealey was provided

sufficient catheters, suppositories, lubricants, and the ability to elevate his feet during his detention at the jail. (Doc. 122-3 at 5-7.)

Plaintiff argues that the City/Parish violated the requirements of the ADA. (Doc. 148 at 12.) Specifically, Plaintiff argues that the City/Parish failed to accommodate his disability by: (1) subjecting him to numerous architectural barriers in the shower facilities; (2) denying Mealey access to the infirmary shower; (3) failing to provide him with a shower chair; (4) providing a non-accessible shower chair; (5) failing to provide a wheelchair while Mealey was incarcerated; (6) failing to provide him with catheters, lubrication, suppositories, and adult diapers; (7) placing Mealey on lockdown because of his disability and/or actual malice; and (8) subjecting him to different terms and conditions of incarceration during lockdown. (*Id.* at 12-34.) Plaintiff also argues that the City/Parish's conduct satisfies the intentional discrimination requirement of the ADA because Mealey made repeated requests for accommodation and the need for accommodation was open, obvious, and readily apparent. (*Id.* at 34-37.)

B. *The Sheriff's arguments*

The Sheriff argues that Plaintiff cannot satisfy the second or third prongs of the test as to Sheriff Gautreaux because he cannot show that the Sheriff failed to reasonably accommodate Mr. Mealey's disability. (Doc. 132-1 at 31.) The Sheriff asserts that Mr. Mealey cannot show a lack of reasonable accommodation because: (1) the City/Parish and not the Sheriff was responsible for responsible for the Prison facility and providing medical care and supplies to inmates at Prison; and (2) no employee of the Sheriff acted with deliberate indifference or with intent to discriminate against Mr. Mealey in regards to the shower, his wheelchair, the grievances, or Mealey's medical supplies. (Doc. 132-1 at 31-42.)

Plaintiff argues that the Sheriff violated the requirements of the ADA/RA. (Doc. 150 at 13-14.) Specifically, Plaintiff argues that the Sheriff failed to accommodate his disability by: (1)

rejecting Mr. Mealey's grievance relating to obtaining a shower chair; (2) rejecting his grievance relating to his broken wheelchair; (3) locking the shower chairs in a closet and not ensuring they were accessible to Mr. Mealey; and (4) implementing a facially discriminatory policy that treats inmates on medical lockdown differently than inmates in the general population by reason of their disability. (Doc 150 at 14-23.) Finally, Plaintiff argues that the Sheriff's actions amounted to intentional discrimination because the Sheriff's employees had knowledge of Mr. Mealey's disability and need for accommodations and auxiliary aids, but nonetheless failed to accommodate.

2. Substantive law

A prisoner may bring claims against their jailors for disability discrimination under Title II of the ADA and Section 504 of the RA.[3] *Pa. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 209–10, 118 S. Ct. 1952, 1954–55, 141 L. Ed. 2d 215 (1998); *see also, e.g.*, *Frame v. City of Arlington*, 657 F.3d 215, 224–25 (5th Cir. 2011). Indeed, the Fifth Circuit has made this point crystal clear: "[T]he ADA plainly covers state institutions without any exception that could cast the coverage of prisons into doubt." *Hall v. Thomas*, 190 F.3d 693, 696 (5th Cir. 1999) (quoting *Yeskey*, 524 U.S. at 209). Some eight years after *Yeskey*, the Supreme Court itself again endorsed this construction. *United States v. Georgia*, 546 U.S. 151, 159, 126 S. Ct. 877, 881, 163 L. Ed. 2d 650 (2006) ("[I]nsofar as Title II [of the ADA] creates a private cause of action for damages against the States for conduct that actually violates the Fourteenth Amendment, Title II validly abrogates state sovereign immunity."); *accord Tennessee v. Lane*, 541 U.S. 509, 533-534, 124 S.

---

[3] Section 504 of the RA protects qualified individuals from discrimination on the basis of disability by entities receiving financial assistance from any federal department or agency. 29 U.S.C. § 794 *et seq.* Passed in 1973, the ADA expanded upon its protections. Naturally, therefore, the same prima facie case be made by a disabled plaintiff under both acts, *Zukle v. Regents of Univ. of Cal.*, 166 F.3d 1041, 1045 (9th Cir. 1999), and courts readily "examine cases construing claims under the ADA, as well as [S]ection 504 of the Rehabilitation Act, because there is no significant difference in the analysis of rights and obligations created by the two Acts," *Vinson v. Thomas*, 288 F.3d 1145, 1152 n.7 (9th Cir. 2002).

Ct. 1978, 1988, 158 L. Ed. 2d 820 (2004).

Title II prohibits discrimination by "public entities," 42 U.S.C. § 12131(1), and state prisons fall squarely within this statutory definition. *Yeskey*, 524 U.S. at 210. "Title II of the ADA provides that '[n]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.'" *Lightbourn v. Cty. of El Paso, Tex.*, 118 F.3d 421, 428 (5th Cir. 1997) (citing, 42 U.S.C. § 12132). "A plaintiff states a claim for relief under Title II if he alleges: (1) that he has a qualifying disability; (2) that he is being denied the benefits of services, programs, or activities for which the public entity is responsible, or is otherwise discriminated against by the public entity; and (3) that such discrimination is by reason of his disability. *Hale v. King*, 642 F.3d 492, 499 (5th Cir. 2011).

Although the ADA's reasonable accommodation requirement does not apply under Title II, its "reasonable modifications" requirement—"A public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity," 28 C.F.R. § 35.130(b)(7); *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 121 S. Ct. 1879, 149 L. Ed. 2d 904 (2001)—has been held to apply in the prison context. *Garrett v. Thaler*, 560 F. App'x 375, 382 (5th Cir. 2014). This distinction has two consequences. Overall, the ADA "does not require prisons to provide **new** services or programs for disabled prisoners." *Borum v. Swisher Cty.*, No. 2:14-CV-127-J, 2015 U.S. Dist. LEXIS 8628, at *21, 2015 WL 327508, at *9 (N.D. Tex. Jan. 26, 2015) (emphasis added). However, these same entities "do have an affirmative obligation to make reasonable modifications . . . so that a disabled prisoner can have meaningful access to

*existing* public services or programs." *Id.* (emphasis added).

Applying the reasonable modification requirement, the Fifth Circuit has explained that

> A public entity's failure to take reasonable measures to remove architectural and other barriers to accessibility, i.e. satisfy the reasonable modification requirement, may constitute denial of services and discrimination sufficient to satisfy the second two prongs of the Title II inquiry. This reasonable modification requirement can be satisfied in a number of ways. For facilities built or altered after 1992, the regulations require compliance with specific architectural accessibility standards. For older facilities, a public entity may comply with Title II by adopting a variety of less costly measures, including relocating services to alternative, accessible sites and assigning aides to assist persons with disabilities in accessing services. Only if these measures are ineffective in achieving accessibility is the public entity required to make reasonable structural changes.

*Garrett v. Thaler*, 560 F. App'x 375, 382 (5th Cir. 2014) (internal citations omitted). "The ADA provides for reasonable accommodation, not preferred accommodation. The accommodation of the inmate's disability need not be ideal; instead, it need only be reasonable and effective. Further, a correctional facility is afforded deference in its determination of an appropriate accommodation." *Arce v. Louisiana*, 226 F. Supp. 3d 643, 651 (E.D. La. 2016).

A plaintiff can recover compensatory damages under Title II of the ADA and § 504 of the RA, if he/she can prove intentional discrimination under the third prong. The Fifth Circuit has held that a defendant's failure to make the reasonable modifications necessary to adjust for the unique needs of disabled persons can constitute intentional discrimination under the ADA and the RA. *See, e.g.*, *Melton v. Dall. Area Rapid Transit*, 391 F.3d 669 (5th Cir. 2004); *Garrett v. Thaler*, 560 F. App'x 375, 382 (5th Cir. 2014). In actuality, no requirement for a showing of an intentional harm has yet been appended to either statute by other circuits. *E.g.*, *Liese v. Indian River Cty. Hosp. Dist.*, 701 F.3d 334, 345 (11th Cir. 2012); *Powers v. MJB Acquisition Corp.*, 184 F.3d 1147, 1153 (10th Cir. 1999). The Fifth Circuit recently explained the parameters of the intent requirement stating,

Though intent is a necessary element of a damages claim, we have previously declined to adopt a specific standard of intent. *See Perez v. Doctors Hosp. at Renaissance, Ltd.*, 624 F. App'x 180, 184 (5th Cir. 2015) (per curiam) (stating that "[w]e did not define what we meant by intent in *Delano–Pyle*"); *see also Frame*, 657 F.3d at 231 n.71 (expressing no opinion on whether failure to make reasonable accommodations constitutes intentional discrimination). Miraglia asserts that "intent" is "purposeful action." He does not unpack that standard, except to say that there is "some distance between" it and "discriminatory animus." The Museum asserts it must be "something more than deliberate indifference." Each party thus defines intent based on what it is not. For Miraglia, it is less than "animus"; for the Museum, it is more than "deliberate indifference."

We need not delineate the precise contours in this case. . . . Instead, we can rely on the widely accepted principle that intent requires that the defendant at least have actual notice of a violation. Other circuits use the deliberate indifference standard. *See S.H. ex rel. Durrell v. Lower Merion Sch. Dist.*, 729 F.3d 248, 262–63 (3d Cir. 2013) (collecting citations from five other circuits and adopting the deliberate indifference standard); *but see Schultz v. Young Men's Christian Ass'n of U.S.*, 139 F.3d 286, 291 (1st Cir. 1998) (seemingly applying a much more difficult standard when it rejected an ADA claim because there was "not the slightest hint that the [defendant] was prompted by malice or hostility toward [the plaintiff] or toward the disabled"). But what is common between our courts and other courts is that a defendant must have notice of the violation before intent will be imputed.

*Miraglia v. Bd. of Supervisors of La. State Museum*, 901 F.3d 565, 575 (5th Cir. 2018).

The Court observes that in case after case, "the Fifth Circuit has held that a defendant's failure to make the reasonable modifications necessary to adjust for the unique needs of disabled persons can constitute intentional discrimination under the ADA." *Hacker v. Cain*, 2016 U.S. Dist. LEXIS 73014, at *40, 2016 WL 3167176, at *13 (M.D. La. June 6, 2016) (citing *Melton v. Dall. Area Rapid Transit*, 391 F.3d 669, 672 (5th Cir.2004), and *Garrett v. Thaler*, 560 F.App'x. 375, 382 (5th Cir. 2014)). As one court explained, "failure to make reasonable accommodations to the needs of a disabled prisoner may have the effect of discriminating against that prisoner because the lack of an accommodation may cause the disabled prisoner to suffer more pain and punishment than non-disabled prisoner." *McCoy v. Tex. Dep't of Crim. Justice*, No. C–05–370, 2006 WL 2331055, at *7 (S.D.Tex. Aug. 9, 2006); see also *United States v. Georgia*, 546 U.S.

151, 157, 126 S. Ct. 877, 880–81, 163 L. Ed. 2d 650, 658 (2006). In fact, "where the defendant otherwise had knowledge of the individual's disability and needs but took no action," not even the failure to expressly request a specific accommodation (or modification) fatally undermines an ADA claim. *Greer v. Richardson Indep. Sch. Dist.*, 472 F.App'x. 287, 296 (5th Cir.2012); *see also Borum v. Swisher Cty.*, No. 2:14–CV–127–J, 2015 WL 327508, at *9 (N.D. Tex. Jan. 26, 2015); *Hinojosa v. Livingston*, 994 F. Supp. 2d 840, 843–44 (S.D. Tex. 2014).

Applying the intentional discrimination prong, the Fifth Circuit explained in a recent case,

> Although a closer question, a jury could also reasonably determine that the County's refusal to accommodate Cadena constituted intentional discrimination. Cadena was admitted in a wheelchair, which she contends was taken away by jail staff. A few hours later, she attempted to walk on crutches in the presence of two County employees and was too unstable to do so. The record shows that the employees were aware that the crutches were unsafe because they obtained a wheelchair and wheeled Cadena the rest of the way to the clinic. And two days later, the County medical staff agreed that Cadena required a wheelchair. Further, Cadena testified that, once at the clinic, she requested a wheelchair, but the nurse who saw her denied the request because the facility did not have space for a person in a wheelchair. Finally, the same employee who had seen Cadena fall while using crutches two days earlier then required Cadena to not only use crutches, but also to carry a tray on crutches, in order to eat.

> These facts are analogous to those in *Delano-Pyle* and *Perez*, in which defendants continued to refuse the requested accommodation despite indications that further accommodation was necessary. *Delano-Pyle*, 302 F.3d at 575–76; *Perez*, 624 F. App'x at 185. . . . The County clearly had wheelchairs at its disposal because Cadena was admitted in a wheelchair and she was allowed to use one to travel to the clinic on her first day. A jury could find, therefore, that its ongoing refusal to let her use a wheelchair or to otherwise modify its policies was intentional.

*Cadena v. El Paso Cty.*, No. 18-50765, 2020 WL 39019, at *5 (5th Cir. Jan. 3, 2020).

Determining whether a plaintiff has met its burden under the ADA invariably requires, "a fact-specific, case-by-case inquiry that considers, among other factors, the effectiveness of . . . [a possible] modification in light of the nature of the disability in question." *Staron v. McDonald's Corp.*, 51 F.3d 353, 356 (2d Cir. 1995); *e.g.*, *cf., Henderson v. Ford Motor Co.*, 403 F.3d 1026,

(8th Cir. 2005) (employment discrimination under the ADA). As another appellate court said, an ADA or RA case frequently rides upon "resolution of . . . complicated, fact-intensive inquiries." *R.K. v. Bd. of Educ.*, 494 F. App'x 589, 597 (6th Cir. 2012).

   3. <u>Analysis</u>

   To establish a prima facie case under the ADA, Mr. Mealey must show "(1) that he has a qualifying disability; (2) that he is being denied the benefits of services, programs, or activities for which the public entity is responsible, or is otherwise discriminated against by the public entity; and (3) that such discrimination is by reason of his disability." *Hale v. King*, 642 F.3d 492, 499 (5th Cir. 2011). To recover compensatory damages, Mr. Mealey must show that the discrimination is intentional. *Miraglia v. Bd. of Supervisors of La. State Museum*, 901 F.3d 565, 575 (5th Cir. 2018).

   Under the first element, the parties agree that Mr. Mealey has paraplegia and uses a wheelchair for mobility. The parties do not dispute that Mr. Mealey has a qualifying disability under the ADA. Instead the parties focus on the second and third prongs: namely, whether Mr. Mealey was denied the benefits of services, programs, or activities or otherwise discriminated against by reason of his disability.

   As previously explained the determination of reasonable modification and whether the lack of reasonable modification resulted in discrimination under Title II of the ADA is a fact-specific inquiry. With that in mind, the Court finds that the voluminous record in this case presents numerous genuine disputes of material facts as to whether the City/Parish and the Sheriff provided reasonable modifications for Mr. Mealey's disability while he was incarcerated in the Prison. Further, as explored below, there are genuine disputes of material facts as to whether any lack of reasonable accommodation amounted to intentional discrimination. This case is similar to the *Cadena v. El Paso Cty*, in which the Fifth Circuit examined whether a

county jail failed to provide reasonable accommodation to an inmate with a broken leg who requested a wheelchair and was given crutches. The court explained,

> There is no dispute that Cadena was a qualifying individual under the ADA. And a disabled inmate's right to mobility within a prison is well-established. *See United States v. Georgia*, 546 U.S. 151, 157, 126 S.Ct. 877, 163 L.Ed.2d 650 (2006) ("[I]t is quite plausible that the alleged deliberate refusal of prison officials to accommodate [the plaintiff's] disability-related needs in such fundamentals as mobility ... constituted 'exclu[sion] from participation in or ... deni[al of] the benefits of' the prison's 'services, programs, or activities.' " (quoting 42 U.S.C. § 12132)). *Cf. Frame*, 657 F.3d at 231 (reaffirming that public entities must make reasonable accommodations for mobility-impaired individuals). Cadena repeatedly requested various types of accommodations, and her disability was open and obvious. Therefore, the County was obligated to provide Cadena with reasonable accommodations that allowed her to access its services. Cadena has pointed to several different types of requests that the County denied. A reasonable jury could find that some, or all, of these requests were reasonable, and that the County violated the ADA by refusing to accommodate Cadena.

*Cadena v. El Paso Cty.*, No. 18-50765, 2020 WL 39019, at *4 (5th Cir. Jan. 3, 2020).

For example, regarding access to the showers/shower chairs, Mr. Mealey has produced sufficient evidence to dispute whether the City/Parish's modifications were reasonable. The City/Parish states that because Mr. Mealey received access to the showers with the assistance from other inmates and that shower chairs were provided throughout the prison, his disability was reasonably accommodated. (Mealey Dep., Doc. 150-34, at 164:3-9; 165:2-4.) Plaintiff however, provides evidence that shower chairs were not available to Mr. Mealey until August 2016. (Mealey Dep., Doc. 150-34, at 117:14-118:5.) And that without a shower chair, to clean himself, Mr. Mealey had to choose between allowing other inmates to hold him up while he showered or showering in his wheelchair which would leave it wet, unless he was able to find a trash bag to cover it. (Mealey Aff., Doc. 150-25 at ¶¶ 8, 9.) Further Plaintiff's Expert, Mr. Heybeck has identified numerous architectural barriers that Plaintiff encountered in the showers that did not allow him to access the showers. (Doc. 123-5.)

Similarly, the Sheriff argues that because the Sheriff is not responsible for providing medical supplies or otherwise responsible for maintenance of the jail that the Sheriff cannot be faulted for the lack of shower chairs. (Doc. 132-1 at 36.) However, in response Plaintiff points to the evidence of Corporal Patrick rejected a grievance asking for a shower chair and did not forward that grievance to Prison Medical Services for review. (Patrick Dep., Doc. 150-35 at 37:11-39:12.) Further, Plaintiff presents evidence that Warden Grimes knew of the need for shower chairs and did not ensure that they were available to Mr. Mealey. Whether Corporal Patrick or Warden Grimes acted with deliberate indifference to Plaintiff's disability is a genuine issue of material fact not appropriate for the Court to resolve at summary judgment.

In addition, regarding access to a wheelchair, the City/Parish maintains that it was not required to provide Mr. Mealey with a wheelchair during his incarceration because the Due Process Clause does not require the City/Parish to replace a personal item, even if it is used for mobility. (Doc 122-3 at 6.) The Court is unpersuaded. Whether or not the Due Process Clause requires the City/Parish to provide a replacement wheelchair to a paraplegic inmate has no bearing on what reasonable modifications are required under Title II of the ADA. Summary judgment is therefore inappropriate.

The Sheriff likewise argues that Plaintiff cannot show that he was denied meaningful access to services and programs available to other non-disabled inmates because of the condition of his wheelchair or that the Sheriff or his employees acted with intentional discrimination against Plaintiff. (Doc. 132-1 at 39.) However, Plaintiff points to the evidence that shows Corporal Patrick rejected a request for accommodation for replacement wheelchair and did not forward the request to Prison Medical Services for review. (Patrick Dep., Doc 150-35 at 40:21-41:14.) In this case, Plaintiff made repeated requests for accommodation that were denied or

ignored, a reasonable jury may be persuaded that some or all of the request were reasonable and that the Sheriff violated that ADA by refusing to accommodate Mr. Mealey. *See Cadena v. El Paso Cty.*, No. 18-50765, 2020 WL 39019, at *4 (5th Cir. Jan. 3, 2020). Further, whether Corporal Patrick acted with deliberate indifference to Plaintiff's disability is a genuine issue of material fact not appropriate for the Court to resolve at summary judgment.

Further, the City/Parish argues that there is no genuine dispute of material fact that Mr. Mealey "received the same access to food, hygienic products, and sleep." (Doc. 122-1 at 6; *See* (Mealey Dep., Doc. 150-34, at. 65:12-24; 66:19-68:5; 71:14-72:25.) It is undisputed that the Prison accepted personal catheters and suppositories from Mr. Mealey's family and distributed them to him during morning and evening pill calls ranging from two catheters until next pill call to an entire box of thirty catheters to be rationed as needed. (Mealey Dep., Doc. 150-34, at 180:10-183:24.) However, Mr. Mealey's testimony also states that he "did not receive a regular supply of suppositories, catheters, or adult diapers." (Mealey Aff., Doc. 150-25 at ¶ 11.) In addition, Mr. Mealey testified that there would be about three days where he would not receive any catheters or an insufficient number of catheters. (Mealey Dep., Doc. 150-34, at 240:24-241:6; see also Mealey Aff., Doc. 150-25 at ¶¶ 13-15.) Due to the continuous shortage of catheters, Mr. Mealey's family would occasionally bring him boxes of catheters. (Mealey Dep., Doc. 150-34, at 241:18-242:8.) As to suppositories, Mr. Mealey testified that he would not receive a suppository about three days a week. (Mealey Dep., Doc. 150-34 at, 241:8-12.) In March of 2016, the Medication Administration Record states that Mr. Mealey received only 21/29 (72%) of his Bisacodyl 10 mg suppository. (Doc. 151-1 at 6.) The medical records also show that during March 2016, Mr. Mealey did not miss an evening pill call when the suppository was distributed. (Doc. 151-1 at 6-7.)

Mr. Mealey's access to catheters, suppositories and adult diapers are disability related needs. *United States v. Georgia*, 546 U.S. 151, 157 (2006) ("In fact, it is quite plausible that the alleged deliberate refusal of prison officials to accommodate [Plaintiff's] disability-related needs in such fundamentals as mobility, hygiene, medical care, and virtually all other prison programs constituted exclusion from participation in or ... denial of the benefits of the prison's services, programs, or activities.") (internal quotations and brackets removed). Whether the City/Parish's actions regarding supplying Mr. Mealey with catheters, suppositories, and adult diapers amounts to a reasonable modification, is a question of fact not appropriate for the Court to resolve at summary judgment.

Whether the City/Parish's actions or the Sheriff's actions amount to a reasonable modification, as required by the ADA is a question of fact not appropriate for the Court to resolve at summary judgment. *Levy v. Louisiana Dep't of Pub. Safety & Corr.*, 371 F. Supp. 3d 274, 286 (M.D. La. 2019) ("Nevertheless, the determination of what, exactly, is necessary to satisfy [the reasonable modification standard] is a material question of fact the Court is unable to resolve at the summary judgment stage.") Further, whether those actions amounted to intentional discrimination due to the City/Parish's or the Sheriff's deliberate indifference to Mr. Mealey's disability is yet another question of fact not appropriate for the Court to resolve at summary judgment.

Because the Court has determined that there are genuine disputes regarding issues of material fact as to the City/Parish's and the Sheriff's reasonable modifications, summary judgment is not appropriate on the Plaintiff's ADA claims. Therefore, to the extent the City/Parish's *Motion for Summary Judgment* or the Sheriff's *Motion for Summary Judgment*

seeks summary judgment on the Plaintiff's ADA claims for lack of reasonable modification, the *Motions* are DENIED.

c. *Constitutional violations pursuant to § 1983*

1. Parties' arguments

The Sheriff argues that Plaintiff cannot prove that Plaintiff suffered an Eighth Amendment or Fourteenth Amendment violation. (Doc. 132-1 at 18-29.)[4] The Sheriff also argues that Mr. Mealey does not have Fourteenth Amendment rights as a pretrial detainee, but instead as a convicted prisoner can only bring claims under the Eighth Amendment as made applicable to the states under the Fourteenth Amendment. Under the Eighth Amendment cruel and unusual punishment standard, the Sheriff argues that

> There is no evidence that Plaintiff suffered a sufficiently serious deprivation that constitutes a denial of the minimal civilized measures of life's necessities. Plaintiff was allowed to shower in the infirmary shower in 2015 at times. Plaintiff was able to shower while being housed in lockdown. Plaintiff was able to shower in J2 with help from inmates pushing him over the hump. Before the shower chair was provided to him in general population, he was never not able to take a shower because there was no shower chair.

(*Id.* at 22.)

Plaintiff responds that there is sufficient evidence to show Mr. Mealey's Eighth Amendment cruel and unusual punishment claims are satisfied, and that it is therefore unnecessary to consider his due process claims under the Fourteenth Amendment at this time. (Doc. 150 at 26.) Further Plaintiff argues that Mr. Mealey's suffered cruel and unusual punishment because he was incarcerated at the Prison in the face of inhumane conditions of confinement due to inadequate access to medical care. (*Id.*)

---

[4] As a threshold matter, the Sheriff argues that the Court properly dismissed any § 1983 claim for violation of the ADA. (Doc. 132-1 at 18.) The Court agrees. In its ruling on the City/Parish and Sheriff's Motions to Dismiss, the Court dismissed with prejudice any § 1983 claim based on violations of the ADA or the RA. (Doc. 44.) Further, the Court notes that the Sheriff's personal liability was previously dismissed and the only relevant § 1983 claims are those against the Sheriff in his official capacity. (*Id.*)

As the Fifth Circuit explains,

"Pretrial detainees and convicted prisoners ... look to different constitutional provisions for their respective rights to basic needs such as medical care and safety." *Hare v. City of Corinth,* 74 F.3d 633, 639 (5th Cir.1996) (en banc). There is no significant distinction, however, between pretrial detainees and convicted inmates when the denial of medical care is at issue. *Gibbs,* 254 F.3d at 548. When the alleged unconstitutional conduct involves an episodic act or omission, as in this case, the question is whether the state official acted with "deliberate indifference" to the inmate's constitutional rights, regardless of whether the individual is a pretrial detainee or state inmate. *Id.*

*McCarty v. Zapata Cty.*, 243 F. App'x 792, 794 (5th Cir. 2007)

Because Plaintiff does not respond to the Sheriff's argument that Mr. Mealey does not have right to bring a claim under the Fourteenth Amendment as a pretrial detainee, and the Court finds that Mr. Mealey has produced sufficient evidence to show that he suffered a Constitutional violation under the Eighth Amendment, the Court need not address the Sheriff's arguments at this time. *Harris v. Angelina Cty., Tex.*, 31 F.3d 331, 334 (5th Cir. 1994) ("Without delving further into the subtleties of this doctrine, we think it sufficient to note that jail conditions which amount to "cruel and unusual punishment" under the Eighth Amendment surely amount to "punishment" under the Fourteenth Amendment."); *Mayfield v. Ellett*, 102 F.3d 549, 1996 WL 670432 (5th Cir. 1996) ("Given the heightened due process protection afforded pretrial detainees, it is apparent that confinement conditions violative of the Eighth Amendment are assuredly violative of a pretrial detainee's due process rights as well.") (unpubl.)

2. Substantive law

   A. *Conditions of Confinement*

As the Fifth Circuit explains,

The Eighth Amendment prohibits punishments which are cruel and unusual. Prison conditions constitute cruel and unusual punishment if they involve the wanton and unnecessary infliction of pain [or if they are] grossly disproportionate to the severity of the crime warranting imprisonment. However, prison conditions are not

> unconstitutional simply because they are restrictive; restrictive conditions are part of the penalty that criminal offenders pay for their offenses against society.

*Hamilton v. Lyons*, 74 F.3d 99, 103–04 (5th Cir. 1996) (internal quotations and citations omitted). Courts are empowered by the Eighth Amendment to oversee the conditions of confinement to uphold the Constitution. However,

> In discharging this oversight responsibility, however, courts cannot assume that state legislatures and prison officials are insensitive to the requirements of the Constitution or to the perplexing sociological problems of how best to achieve the goals of the penal function in the criminal justice system: to punish justly, to deter future crime, and to return imprisoned persons to society with an improved change of being useful, law-abiding citizens.

*Rhodes v. Chapman*, 452 U.S. 337, 352 (1981).

For a Plaintiff to recover for violations of the Eighth Amendment right to be protected from cruel and unusual punishment because of the conditions of his confinement in a prison, the Plaintiff must prove by a preponderance of the evidence that "1. the prison conditions resulted in an extreme deprivation of the minimal measure of life's necessities; and 2. Defendant acted with deliberate indifference." Pattern Civ. Jury Instr. 5th Cir. 10.9 (2014). As to the first element,

> it is not enough that the conditions were restrictive or even harsh. This is part of the penalty that criminal offenders must pay. You may find that the conditions of Plaintiff 's confinement amounted to an extreme deprivation—and were therefore cruel and unusual punishment—only if they deprived *[him]* of the minimal civilized measure of life's necessities. In deciding whether Plaintiff has proved an extreme deprivation, you should ask whether society considers the risk that the prisoner complains of to be so grave that it violates contemporary standards of decency to expose anyone unwillingly to such a risk.

*Id.* As to the second element,

> Deliberate indifference in this context means that the official knows of and disregards an excessive risk to inmate health or safety. The official must: (1) be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists; and (2) must draw that inference. Deliberate indifference may be inferred if the risk of harm is obvious.

*Id.; see Estelle v. Gamble,* 429 U.S. 97, 106 (1976); *Johnson v. Treen,* 759 F.2d 1236, 1237 (5th

Cir. 1985).

The Supreme Court has explained that under the Eighth Amendment a claim under the

conditions of confinement analysis can incorporate an allegation for inadequate access to

medical care. Specifically, the Supreme Court explained:

> From that standpoint, we see no significant distinction between claims alleging
> inadequate medical care and those alleging inadequate "conditions of
> confinement." Indeed, the medical care a prisoner receives is just as much a
> "condition" of his confinement as the food he is fed, the clothes he is issued, the
> temperature he is subjected to in his cell, and the protection he is afforded against
> other inmates. There is no indication that, as a general matter, the actions of prison
> officials with respect to these nonmedical conditions are taken under materially
> different constraints than their actions with respect to medical conditions. Thus, as
> retired Justice Powell has concluded: "Whether one characterizes the treatment
> received by [the prisoner] as inhumane conditions of confinement, failure to attend
> to his medical needs, or a combination of both, it is appropriate to apply the
> 'deliberate indifference' standard articulated in *Estelle.*"

*Wilson v. Seiter*, 501 U.S. 294, 303 (1991).

> B.  *Inadequate medical treatment*

As the Fifth Circuit explained, the Eighth Amendment's prohibition on cruel and unusual

punishment is also violated if prison officials

> are deliberately indifferent to an inmate's serious medical needs . . . Not all
> inadequate medical treatment rises to the level of an Eighth Amendment violation;
> [i]t is only such indifference that can offend 'evolving standards of decency' in
> violation of the Eighth Amendment.  A plaintiff must prove objectively that he was
> exposed to a substantial risk of serious harm, and that jail officials acted or failed
> to act with deliberate indifference to that risk, which requires actual knowledge and
> deliberate disregard.

*Victoria W. v. Larpenter*, 369 F.3d 475, 483 (5th Cir. 2004) (alteration in original, internal

quotations and citations omitted). The Fifth Circuit's pattern jury instruction on a plaintiff's

claim that a prison official violated their Eighth Amendment right to adequate medical care states

that a plaintiff must prove by a preponderance of the evidence that: "1. Plaintiff was exposed to a

substantial risk of serious harm; 2. Defendant displayed deliberate indifference to that risk; and

3. Defendant's deliberate indifference harmed Plaintiff." Pattern Civ. Jury Instr. 5th Cir. 10.8

(2014).

> As to the first element,

> The first element focuses on whether the illness or injury was so serious that the failure to treat it constituted unnecessary and wanton infliction of pain. To satisfy this test, Plaintiff must show that the alleged failure to provide adequate health care posed a substantial risk of serious harm to [his/her] health. This element asks whether, based on all of the circumstances that were present, a reasonable person would view the illness or injury as sufficiently serious to make the failure to treat it a wanton infliction of pain. This inquiry is what a reasonable person would have concluded and does not consider Defendant's state of mind.

*Id.*

> As to the second element,

> The second element—deliberate indifference—requires proof of egregious conduct. Plaintiff must prove Defendant knew of and disregarded an excessive risk to Plaintiff 's health or safety. In other words, Plaintiff must prove Defendant: (1) was aware of facts from which the inference could be drawn that a substantial risk of serious harm existed; and (2) actually drew that inference. An inmate's disagreement with the type or amount of medical treatment [he/she] receives is not sufficient to meet this test.

*Id.* As such, a plaintiff must establish that a defendant: "[R]efused to treat him, ignored his

complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would

clearly evince a wanton disregard for any serious medical needs." *Domino v. Texas Dept. of*

*Criminal Justice,* 239 F.3d 752, 756 (5th Cir. 2001) (quoting *Johnson,* 759 F.2d at 1238).

> Where prison authorities deny reasonable requests for medical treatment, however, and such denial exposes the inmate to undue suffering or the threat of tangible residual injury, deliberate indifference is manifest. Similarly, where "knowledge of the need for medical care [is accompanied by the] ... intentional refusal to provide that care," the deliberate indifference standard has been met.

*Monmouth Cty. Corr. Institutional Inmates v. Lanzaro*, 834 F.2d 326, 346 (3d Cir. 1987)

(internal citations omitted). Moreover, "deliberate indifference" is usually demonstrated by a

pattern of similar violations. *Evett v. DETNTFF*, 330 F. 3d 681, 689 (5th Cir. 2003). "A claim against prison officials and/or prison medical professionals for failure to provide medical care is 'fact-intensive.'" *Randolph*, 987 F. Supp. 2d 605, 624 (E.D. Pa. 2013) (alterations in original) (internal citation omitted).

   3.   <u>Analysis</u>

First, the Court finds that Plaintiff has produced evidence sufficient to show that a reasonable jury could conclude that Mr. Mealey suffered cruel and unusual punishment due to inhumane conditions of confinement because of the lack of access to medical care at the Prison.

Plaintiff has produced sufficient evidence to create a question of fact as to whether the Prison conditions resulted in an extreme deprivation of the minimal measure of life's necessities. Mr. Mealey is a paraplegic and as a result of his condition must use catheters and suppositories. (Mealey Dep., Doc. 150-34, at 19:10-12, 180:1-3; Mealey Aff., Doc. 150-25 at ¶ 16..) Mr. Mealey recounted that due to inadequate access to medical care, Mr. Mealey went without catheters, lubrication for his catheters, suppositories, and adult diapers. (Mealey Aff., Doc. 150-25 at ¶ 16.) Mr. Mealey describes that even when he had catheters, the lack of lubrication for those catheters meant that he had to use his own spit to insert them into his urethra. (Mealey Aff., Doc. 150-25 at ¶ 17.) Further, the lack of suppositories meant that he had to physically remove fecal matter from his anal cavity. (*Id.*) The lack of access to adult diapers meant that he also was forced to sit in his own fecal matter.

Coupled with this lack of access to basic hygienic items is the fact that Mr. Mealey was not able to meaningfully clean his body because of the lack of useable shower chairs and the fact that he was turned away from showering in the Infirmary. (*Id.* at ¶ 4.) Although both Defendants make much of the testimony that Mr. Mealey was always able to propel his wheelchair into the showers while he was in the general prison population, Plaintiff meaningfully points out that this

28

does not mean Mr. Mealey was able to clean himself in the shower. Mr. Mealey's testimony shows that to attempt to clean himself he had to: (1) shower in his wheelchair which left it and him sitting in a damp wheelchair that smelled of fecal matter; (2) ask other prisoners to hold him, which put him in their debt, or (3) try to find a trash bag to cover his wheelchair. (Mealey Aff., Doc. 150-25 at ¶ 4.) Mr. Mealey also points to evidence that as a result of the lack of hygienic supplies, the inability to shower, he developed ulcers, and bed sores as well as suffered a fall from his wheelchair that had broken due to mold and rust.

The caselaw is mixed as to whether the deprivation of a shower chair or the ability to take a shower alone is a sufficiently serious deprivation that constitutes a denial of the minimal civilized measures of life's necessities. *Compare Shockley v. Jones,* 823 F.2d 1068 (7th Cir.1987) (no constitutional violation even though paraplegic inmate was seriously injured due to lack of shower chair) *with Bradley v. Puckett,* 157 F.3d 1022 (5th Cir.1998) (finding that, if proven, the allegations of a disabled inmate who was not provided with a shower chair for over two months, resulting in him using toilet water in his cell to bath were sufficient to state a claim under the Eighth Amendment.)  However, in this case, the Court concludes that this evidence, if proven at trial, could lead a reasonable juror to conclude that the conditions Mr. Mealey complains of were "so grave that it violates society's contemporary standards of decency to expose anyone unwillingly to such a risk." Pattern Civ. Jury Instr. 5th Cir. 10.9 (2014).

As to the second element, Plaintiff has produced sufficient evidence to show that prison officials and medical staff at the Prison acted with deliberate indifference. Specifically, Mr. Mealey points to evidence that shows that when Mr. Mealey requested that prison officials and medical staff provide access to hygienic supplies or allow him to shower in the Infirmary, he was repeatedly turned away. As previously explained,

> Deliberate indifference in this context means that the official knows of and
> disregards an excessive risk to inmate health or safety. The official must: (1) be
> aware of facts from which the inference could be drawn that a substantial risk of
> serious harm exists; and (2) must draw that inference. Deliberate indifference may
> be inferred if the risk of harm is obvious.

Mr. Mealey's repeated requests through inmate grievances that were rejected by both the Sheriff's employees and Prison Medical Service employees provided those prison officials and nurses with actual knowledge that a substantial risk of serious harm existed. Furthermore, if proven true that Mr. Mealey (1) smelled of fecal matter due to his lack of access to suppositories and adult diapers; (2) suffered repeated falls from his broken wheelchair due to using it in the shower with injuries treated in the Infirmary; (3) suffered urinary tract infections from a lack of sufficient catheters and lubrication that were treated in the Infirmary, then it is a reasonable inference that the risk of harm was obvious. As such, the Court concludes that Mr. Mealey has produced sufficient evidence to show that the prison officials and nurses were deliberately indifferent to the inhumane conditions of confinement Mr. Mealey suffered from an inadequate access to medical care.

### d. Municipal Liability

The Court now turns to whether Mr. Mealey has produced sufficient evidence to show a genuine dispute of material fact as to the City/Parish's liability or the Sheriff's liability for the Constitutional violation under the *Monell* theory of municipal liability.

#### 1. Parties' arguments

The City/Parish argues that Plaintiff cannot prove any of the elements under *Monell* to establish municipal liability under § 1983. First, the City/Parish argues that Mr. Mealey does not identify an official policymaker. Second, the City/Parish argues that the Court should not "infer the existence of a de facto policy of failing to adequately accommodate Mealey's disability and provide him with the necessary medical care." (Doc. 122-3 at 9.) Third, the City/Parish maintains

that Mr. Mealey cannot show that any de facto policy of insufficient medical care was the moving force behind the constitutional deprivation. (Doc. 122-3 at 10.)

In opposition, Plaintiff points to evidence that suggests that the City/Parish created (1) an identifiable intended condition or practice of inadequate access to healthcare and medical services due to a systemic breakdown of care at the Prison; (2) the systemic breakdown of care was not reasonably related to a legitimate governmental purpose; (3) the systemic breakdown of care was the moving force that caused Mr. Mealey to suffer cruel and unusual punishment because of the inhumane conditions of confinement due to lack of access to medical care. (Doc. 148 at 40-52.)

The Sheriff argues that the official capacity claims against him should be dismissed with prejudice because: (1) there is no evidence to show that any policy or custom of the Sheriff was the moving force behind the alleged violation of the Plaintiff's constitutional rights; (2) the Plaintiff cannot show deliberate indifference on the part of the Sheriff; (3) there is no evidence to suggest that the Sheriff had actual or constructive knowledge that there was a policy or custom at the Prison of the Sheriff failing to accommodate inmates with disabilities.

Plaintiff responds that (1) the Sheriff incarcerated detainees at EBRPP in the face of inhumane conditions of confinement and grossly inadequate access to healthcare and medical services and Warden Grimes and other Sheriff employees were critically involved with the provision of healthcare to inmates at the Prison, (Doc. 150 at 26); (2) the systemic conditions were not reasonably related to a legitimate governmental purpose, (Doc. 150 at 31) and (3) the moving force of the Sheriff's policy and practice of incarcerating detainees at the Prison, given its unreasonable conditions of confinement, violated Plaintiff's right to be free from deliberate interference to his medical needs and cruel and unusual punishment. (*Id.*)

2. <u>Substantive Law</u>

Named after the famed case that first recognized it, *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 665, (1978), *Monell* liability requires proof of four elements: (1) a policymaker; (2) an official policy; (3) a constitutional violation;[5] and (4) a violation of that constitutional right whose "moving force" is "the policy or custom," *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001) (construing (3) and (4) as one element). The Fifth Circuit pattern jury instructions state that to establish municipal liability a plaintiff must prove the following elements by a preponderance of the evidence:

> 1. an official policy or custom existed; 2. a policymaker for the [City/Parish] knew or should have known about the policy or custom; 3. the policymaker was deliberately indifferent; and 4. the policy or custom was the moving force leading to the constitutional violation.

Pattern Civ. Jury Instr. 5th Cir. 10.5 (2014). Stated differently, "[a] plaintiff must point to a persistent and widespread practice[] of municipal [or state] officials, the duration and frequency of which indicate that policymakers (1) had actual or constructive knowledge of the conduct, and (2) failed to correct it due to their deliberate indifference"; as such, knowledge and indifference, factors incorporating subjective and objective components, are required, as is an actual threshold constitutional violation. *Owens v. Balt. City State's Attys. Office*, 767 F.3d 379, 402–03 (4th Cir. 2014); *see also, e.g.*, *Bd. of Cty. Comm'rs v. Brown*, 520 U.S. 397, 404, 117 S. Ct. 1382, 1388, 137 L. Ed. 2d 626 (1997) ("The plaintiff must also demonstrate that, through its deliberate conduct, the municipality was the moving force behind the injury alleged. That is, a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal

---

[5] Arguably, the mere deprivation of a federal right will suffice. *King v. Kramer*, 764 F.3d 635, 649 (7th Cir. 2014).

rights." (internal quotation marks and emphasis omitted)); *Thomas v. City of Chattanooga*, 398

F.3d 426, 429 (6th Cir. 2005) (enumerating the pertinent elements).

Further, as a threshold matter Plaintiff must identify the policymaker. Regarding this

element, the Supreme Court explained that

> the identification of policymaking officials is a question of state law. Authority to make municipal policy may be granted directly by a legislative enactment or may be delegated by an official who possesses such authority, and of course, whether an official had final policymaking authority is a question of state law. Thus the identification of policymaking officials is not a question of federal law, and it is not a question of fact in the usual sense. The States have extremely wide latitude in determining the form that local government takes, and local preferences have led to a profusion of distinct forms. Among the many kinds of municipal corporations, political subdivisions, and special districts of all sorts, one may expect to find a rich variety of ways in which the power of government is distributed among a host of different officials and official bodies. Without attempting to canvass the numberless factual scenarios that may come to light in litigation, we can be confident that state law (which may include valid local ordinances and regulations) will always direct a court to some official or body that has the responsibility for making law or setting policy in any given area of a local government's business.

*City of St. Louis v. Praprotnik*, 485 U.S. 112, 124–25 (1988). In a case the following year, the

Supreme Court reiterated that the identification of a policymaker is

> a legal question to be resolved by the trial judge *before* the case is submitted to the jury. Reviewing the relevant legal materials, including state and local positive law, as well as 'custom or usage' having the force of law, the trial judge must identify those officials or governmental bodies who speak with final policymaking authority for the local governmental actor concerning the action alleged to have caused the particular constitutional or statutory violation at issue.

*Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737, 109 S. Ct. 2702, 2724, 105 L. Ed. 2d 598

(1989).

As to the second element, identifying an official policy or custom, *Monell* "presupposes a

conscious adoption of a course of action 'from among various alternatives.'" *Shadrick v.*

*Hopkins Cty., Ky.,* 805 F.3d 724, 752 (6th Cir. 2015). The Fifth Circuit pattern jury instructions

define the terms of the element as follows:

A "policy" can be a policy statement, ordinance, regulation, or decision officially adopted and promulgated by the [City/Parish's] officers. A "custom" is a persistent, widespread practice of [City/Parish] officials or employees that, although not formally adopted, is so common and well-settled that it fairly represents [City/Parish] policy. But to show a custom, Plaintiff [] must prove that either the [City/Parish's] governing body or some official with policymaking authority knew or should have known about the custom.

Pattern Civ. Jury Instr. 5th Cir. 10.5 (2014).

Therefore, "[a] policy or custom becomes official for purposes of § 1983 when it results from the decision or acquiescence of the municipal officer or body. . ." *Gros*, 181 F.3d at 615. The Fifth Circuit has accepted that a policy can be inferred by a pattern of acts or omissions "sufficiently extended or pervasive, or otherwise typical of extended or pervasive misconduct by [jail] officials, to prove an intended condition or practice." *Shepherd v. Dallas Cty.,* 591 F.3d 445, 452 (5th Cir. 2009) (quoting *Hare v. City of Corinth, Miss.,* 74 F.3d 633, 645 (5th Cir. 1996)).[6] As the Fifth Circuit has explained, "[a] successful showing of such a pattern "requires similarity and specificity." *Hicks-Fields v. Harris Cty., Texas*, 860 F.3d 803, 810 (5th Cir. 2017). More specifically, the Fifth Circuit has said, "[p]roving a pattern is a heavy burden, one that has rarely been met in our caselaw." *Shepherd* at 591 F.3d 452. *Shepherd* further stated:

> [I]solated examples of illness, injury, or even death, standing alone, cannot prove that conditions of confinement are constitutionally inadequate. Nor can the incidence of diseases or infections, standing alone, imply unconstitutional confinement conditions, since any densely populated residence may be subject to outbreaks. Allegations of insufficient funding are similarly unavailing. Rather, a detainee challenging jail conditions must demonstrate a pervasive pattern of serious

---

[6] The standards for a *Monell* claim and for a conditions of confinement claim are similar and frequently overlap. *See Colbert v. City of Baton Rouge/Parish of East Baton Rouge*, 2018 WL 2224062, at *6 (M.D. La. May 15, 2018) ("Because of Plaintiffs' failure to plausibly plead *Monell* liability, Plaintiffs are unable to satisfy the pleading requirements of the conditions of confinement theory."); *Duvall*, 631 F.3d at 208 ("The jury found that Duvall's injury was caused by a policy or custom of the County. Although the jury found this fact in response to the court's instruction on municipal liability under the *Monell* test, the jury's finding satisfies the need for such a showing in connection with the underlying [conditions-of-confinement] constitutional violation as well. . . . We see no meaningful difference between these showings. . . . [W]e are convinced that the jury's finding of a custom or policy under the municipal-liability jury instruction satisfies the custom-or-policy element for purposes of the underlying constitutional violation.").

deficiencies in providing for his basic human needs; any lesser showing cannot prove punishment in violation of the detainee's Due Process rights.

*Shepherd*, 591 F.3d at 454.

Thus, in *Shepherd*, the Fifth Circuit affirmed a jury's finding of unconstitutional conditions of confinement when "serious injury and death were the inevitable results of the jail's" practices. *Shepherd*, 591 F.3d at 454. Similarly, in *Duvall*, the Fifth Circuit affirmed a jury's finding of a *de facto* policy of subjecting inmates to a disease when "the Jail experienced around 200 infections per month," and the County was aware of the "bizarrely high incidence" of the disease. *Duvall*, 631 F.3d at 208.

Conversely, in *Estate of Henson v. Wichita Cty., Tex.*, 795 F.3d 456 (5th Cir. 2015) (which cited the above from *Shepherd* and *Duvall* as comparative authority), the Fifth Circuit found that "Plaintiff's evidence of one other death that took place in jail four months prior [was] not sufficient to show that the jail's medical staffing was constitutionally inadequate." *Id.* at 469–70. *Estate of Henson* relied on *Shepherd*'s statement that "[i]solated examples of illness, injury, or even death, standing alone, cannot prove that conditions of confinement are constitutionally inadequate." *Id.* (quoting *Shepherd*, 591 F.3d at 454).

Returning to the comparison to *Monell* claims, the Fifth Circuit has also stated, with respect to practices and customs: "A pattern is tantamount to official policy when it is 'so common and well-settled as to constitute a custom that fairly represents municipal policy.' " *Peterson v. City of Fort Worth, Tex.*, 588 F.3d 838, 850 (5th Cir. 2009) (quoting *Piotrowski v. City of Hous.*, 237 F.3d 567, 579 (5th Cir. 2001)). "Where prior incidents are used to prove a pattern, they 'must have occurred for so long or so frequently that the course of conduct warrants the attribution to the governing body of knowledge that the objectionable conduct is the expected, accepted practice of city employees.' " *Id.* (quoting *Webster v. City of Houston,* 735

F.2d 838, 842 (5th Cir. 1984)). "It is thus clear that a plaintiff must demonstrate 'a pattern of abuses that transcends the error made in a single case.' " *Id.* at 850–51 (quoting *Piotrowski,* 237 F.3d at 582 (citations omitted)). "A pattern requires similarity and specificity; '[p]rior indications cannot simply be for any and all "bad" or unwise acts, but rather must point to the specific violation in question.' " *Id.* at 851 (quoting *Estate of Davis ex rel. McCully v. City of North Richland Hills,* 406 F.3d 375, 383 (5th Cir. 2005)). " 'While the specificity required should not be exaggerated, [the Fifth Circuit's] cases require that the prior acts be fairly similar to what ultimately transpired. . . .' " *Hicks-Fields v. Harris Cty., Tex.*, 860 F.3d 803, 810 (5th Cir. 2017) (quoting *Estate of Davis*, 406 F.3d at 383).

Thus, in *Hicks-Fields*, where a mentally ill detainee was punched by a guard, fell, hit his head, and later died, the Fifth Circuit found that the plaintiffs failed to satisfy the specificity requirement. *Id.* at 810. Plaintiffs pointed to a DOJ report, but much of it involved constitutional deficiencies that were "not on all-fours with those complained of by Plaintiffs, such as issues related to medical care for inmates with chronic conditions, medical record-keeping, overcrowding, and sanitation." *Id.* Two subsections related to allegedly inadequate mental health care and allegedly excessive uses of force were "on point and relevant . . in a broad sense . . . [and] provide[d] examples of these broad themes to illustrate with greater specificity the unconstitutional patterns identified by DOJ experts." *Id.* However, the Fifth Circuit still found that "these specific examples do not resemble—with sufficient similarity—the constitutional violations alleged by Plaintiffs so as to establish the required pattern of that unconstitutional conduct," particularly when viewed, as they must be, against the "major jail facility" where the decedent was housed. *Id.* The Fifth Circuit concluded:

> Plaintiffs have not met their evidentiary burden of showing a genuine dispute of
> material fact as to the existence of a "persistent, widespread practice of city officials

or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well settled as to constitute a custom that fairly represents municipal policy." [*Webster v. City of Hous.*, 735 F.2d 838, 841 (5th Cir. 1984).] Quite simply, under our precedent, Plaintiffs have not produced sufficient evidence of similar acts to move to trial.

*Hicks-Fields*, 860 F.3d at 810–811.

Additionally, "[a] pattern also requires 'sufficiently numerous prior incidents,' as opposed to 'isolated instances.' " *Peterson*, 588 F.3d at 851 (quoting *McConney v. City of Houston,* 863 F.2d 1180, 1184 (5th Cir.1989)). Thus, in *Pineda v. City of Houston*, 291 F.3d 325 (5th Cir. 2002), the Fifth Circuit held that eleven instances of warrantless entry did not support a pattern of unconstitutional warrantless entry given the size of the city and the police force. *Id.* at 329. In *Peterson*, the Fifth Circuit found that 27 complaints of excessive force between 2002 and 2005 were insufficient to constitute a pattern, as almost all of the incidents involved small crimes with minor injuries, and the police force was large. *Peterson*, 588 F.3d at 851.

Regarding the third element, the Fifth Circuit has explained, "Actual or constructive knowledge of [a] custom must be attributable to the governing body of the municipality or to an official to whom that body has delegated policy-making authority." *Webster*, 735 F.2d at 854. Further,

"[I]t is plain that municipal liability may be imposed for a single decision by municipal policymakers under appropriate circumstances. No one has ever doubted, for instance, that a municipality may be liable under Section 1983 for a single decision by its properly constituted legislative body—whether or not that body had taken similar action in the past or intended to do so in the future—*because even a single decision by such a body unquestionably constitutes an act of official government policy.*"

*Howell v. Town of Ball*, 827 F.3d 515, 527 (5th Cir. 2016) (emphasis added).

As to deliberate indifference, the pattern jury instructions define:

For an official to act with deliberate indifference, the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and [he/she] must also draw the inference.

Pattern Civ. Jury Instr. 5th Cir. 10.5 (2014).

Finally, the fourth element is whether the implicit policy of discrimination was the "moving force" behind Plaintiff's injury. To determine whether a defendant's action constitutes the "moving force" of an injury, a plaintiff must show that the "defendant set in motion a series of events that defendant knew or reasonably should have known would cause others to deprive plaintiff of [his/her] constitutional rights." *Martinez v. Carson*, 697 F.3d 1252, 1255 (10th Cir. 2012). Regarding specific causation, the Supreme Court has held,

> [It] is axiomatic under tort law that the exercise of judgment by the decisionmaker does not prevent the earlier agent's action (and hence the earlier agent's discretionary animus) from being the proximate cause of the harm. Proximate cause requires only "some direct relation between the injury asserted and the injurious conduct alleged," and excludes only those "link[s] that [are] too remote, purely contingent, or indirect."

*Staub v. Proctor Hosp.*, 562 U.S. 411, 419, 131 S. Ct. 1186, 1192, 179 L. Ed. 2d 144 (2011).

4. <u>Analysis</u>

A. *<u>The City/Parish and the Sheriff are official policymakers under Louisiana state law.</u>*

First, regarding an official policymaker, the City/Parish argues that

> Mealey fails to identify a policymaker attributable to the City/Parish's association with the jail. The only identification made within the entirety of the lawsuit is to the City/Parish as a named party-defendant. While the City/Parish is a juridical entity capable of being sued, the City/Parish itself is not a policymaker. There are over thirty departments comprising the City/Parish and directors associated with each. However, none have been identified as policymakers.

(Doc. 122-3 at 9, (internal citations omitted).)

The question of the policymaker is a legal issue that depends on an analysis of relevant state and local law. *Jett*, 491 U.S. at 737; *see Bolton v. City of Dallas, Tex.*, 541 F.3d 545, 548 (5th Cir. 2008) ("this court's task is to identify those officials or governmental bodies who speak with final policymaking authority for the local governmental actor concerning the action alleged to have caused the particular constitutional or statutory violation at issue. This inquiry is specific

to the particular action at issue and depends on an analysis of relevant state and local law.") (internal quotations and citations omitted).

As previously explained, under Louisiana state law, the governing authority of each parish is responsible for the conditions and maintenance of the prisons being operated by that authority. *Arce v. Louisiana*, 226 F. Supp. 3d 643, 649 (E.D. La. 2016) ("[T]he parish does have the responsibility of financing and physically maintaining the jail. It follows that, at the very least, the parish may be held liable when the physical jail facility itself does not comply with federal standards. It is also conceivable that to the extent the jail's deficiencies are attributable solely to a lack of adequate funding, the parish's obligation to fund the jail could be implicated and the parish might be held responsible.")

Further, as the Court previously explained, under Louisiana state law the Sheriff is the governing authority responsible for the operations of the prison as "the keeper of the public jail of his parish." La R.S. 15:704. For example, in this role, the Sheriff is responsible for "supply[ing] each prisoner daily with wholesome food sufficient in quantity for the proper maintenance of life . . . [and] provid[ing] the prisoners with clothing suited to and sufficient for the season." La. R.S. 15:705. The Sheriff can seek reimbursement from the parish governing authority for any expenses he undertakes to provide for prisoners. *Id.*

The Court therefore concludes that as a matter of law, the City/Parish through the Metropolitan Council is the policymaker responsible for financing and physically maintaining the jail. In addition, the evidence shows that the Metropolitan Council was the policymaker at issue regarding the financing, medical services, and physical maintenance of the Prison. First, the Prison Medical Service budget, was presented to the mayor's office and then to the Metro Council for approval. (Cashio Dep., Doc. 150-37 at 33:6-11.) In addition, deposition testimony

of Mr. William B. Daniel IV, the Chief Administrative Officer of the City/Parish that states,

"Now, was I worried that our prison because of our facilities might be under a consent decree at

some point in the future? Yes. And we tried on at least two occasions to build a new prison in the

parish but it was rejected by the council." (Daniel Dep., Doc. 150-41 at 36:23-37:8.) The Court

also concludes that as a matter of law, the Sheriff was the policymaker in regards to the

operations at the Prison that fell outside of the scope of the City/Parish's responsibility to

maintain a good jail.

Because as a matter of Louisiana state law, the Metropolitan Council of the City/Parish

and the Sheriff are the policymakers responsible for the Prison, the Court will not grant summary

judgment to the City/Parish based on the argument that Plaintiff does not identify a policymaker.

   B.  *Plaintiff presents sufficient facts to show that the City/Parish created an official*
       *policy of inadequate access to healthcare and medical services.*

As to the second element, an official policy, The City/Parish argues that it would be

improper for the Court to infer that an official policy existed because:

> Mealey presents no evidence or information to support such a pattern even in light
> of the fact that Mealey was incarcerated at the jail only three years prior to his
> incarceration made the subject herein. Instead, based upon the approximate 700
> pages of documented medical care he received, there is no inference to reasonably
> suggest that Mealey was ignored or otherwise provided less than those around him.

(Doc. 122-3 at 10.) Despite this assertion, Plaintiff points to evidence that suggests that the

City/Parish has created an identifiable intended condition or practice of inadequate access to

healthcare and medical services due to a systemic breakdown of care at the Prison. Specifically,

Plaintiff highlights his repeated requests for equipment and supplies, including requests for a

wheelchair and a shower chair, catheters, lubrication and adult diapers, and for access to the

infirmary shower. (Mealey Dep., Doc. 150-34 at 80:6-19; 185:21-186:10, 245:6-13; Mealey Aff.,

Doc. 150-25¶ 16.) Plaintiff also details that there was not care provided or a policy in place to

recognize and treat pressure ulcers for disabled inmates. (Simpson Dep., Doc. 150-39 at II:95:22-96:1.)

In addition to the pattern of a systemic breakdown of care that the Plaintiff experienced, Plaintiff also points to the reports detailing the overall failures of Prison Medical Services made to the Baton Rouge Metropolitan Council by Ms. Beatrice Stines the Prison Medical Services Director of Nurses, and by Health Management Associates. In February 2016, the Baton Rouge Metropolitan Council was informed by Ms. Stines of the Prison's need for more supplies and staff. (Beatrice Stines Dep., Doc. 150-33 at 28:8-25.) Ms. Stines testimony stated that Prison Medical Services needed "at least double" the number of nurses, and that Prison Medical Services "lacked equipment and some of the necessary supplies." (Beatrice Stines Dep., Doc. 150-33 at 30:17-31:1, 44:24-45:4.) Ms. Stines also explained that the equipment available to medical staff in the Prison amounted to "a bathroom scale" and that the shortages included wheelchairs. (*Id* at 38:11-22; 155:10-22.)

At the request of the Metropolitan Board, Health Management Associates conduced an onsite visit from February 23-26, 2016, interviewed staff, and looked at the Prison Medical Services Records. (Doc. 150-15, Doc. 150-36.) Once its independent study was completed, Health Management Associates Report and Recommendations for Clinical Operations ("Report") reported its findings to the City/Parish administrators and the Metropolitan Board. (Daniel Dep., Doc. 150-41 at 25:10-15.) The Report outlined that the medical care was "insufficient to meet the needs of the EBR prison population" the "physical plant is notably deficient" and "need sufficient ADA compliant space for population." (Doc. 150-18 at pp. 11, 23.) The report likewise details a "notable vacancy rate for RN and LPN positions" and that "medical provider staffing[was] insufficient." (Doc. 150-18 at pp. 11 and 12.) Further it

highlighted that the health care provided was "episodic and inconsistent" and that the Prison would not pass standards outlined by the National Commission on Correctional Health Care's standards for healthcare in a correctional facility. (Doc. 150-18 at pp. 24 and 25.)

The Court also takes judicial notice of the articles and publicity surrounding both the Prison Medical Service staffs' and the Health Management Associates presentation to the Metropolitan Board. *Weaver v. United States*, 298 F.2d 496, 498–99 (5th Cir. 1962) ("Judicial notice may be taken of facts known at once with certainty by all the reasonably intelligent people in the community without the need of resorting to any evidential data at all. Judicial notice may be taken without request by a party of such facts as are so generally known or of such common notoriety within the territorial jurisdiction of the court that they cannot reasonably be the subject of dispute. Specific facts and propositions of generalized knowledge which are capable of immediate and accurate determination by resort to easily accessible sources of indisputable accuracy may be judicially noticed. McCormick on Evidence, Judicial Notice, Section 323 at p. 688 and footnote citing Uniform Rules of Evidence, Rule 9."); *see also U.S. ex rel. Lam v. Tenet Healthcare Corp.*, 481 F. Supp. 2d 673, 680 (W.D. Tex. 2006) ("Pursuant to Rule 201(b), Courts have the power to take judicial notice of the coverage and existence of newspaper and magazine articles. *See, e.g., Washington Post v. Robinson,* 935 F.2d 282, 291 (D.C. Cir. 1991) (allowing judicial notice of the existence of newspaper articles); *Jackson v. Godwin,* 400 F.2d 529, 536 (5th Cir. 1968) (finding that newspapers and magazines allowed in a prison carried extensive coverage of riots to the point where the district court could take judicial notice of such coverage).").

Starting in August 2015, local media sources reported that the medical staff testified to the Metropolitan Council that they lacked "functional equipment and routinely [ran] out of

supplies as basic as Neosporin for wound care." Rebekah Allen and Andrea Gallo, *Medical staff at East Baton Rouge Parish Prison say they are understaffed, overworked and lack critical supplies*, The Advocate, August 27, 2015. The article further details that Dr. Rani Whitfield reported to the Metropolitan Council that there has been a "significant decline in the quality of care delivered to the inmate population over the past six or seven years." *Id.* On February 25, 2016, Chad Guillot and Rintha Simpson testified that more nurses and supplies were still necessary. Andrea Gallo, *At Metro Council meeting, doctor at Baton Rouge Prison says facility 'not the best place to work'*, The Advocate, February 25, 2016. The article details that Councilwoman Donna Collins-Lewis was shocked by the conditions of the medical facility. *Id.* Another article on February 25, 2016 highlighted that Councilwoman Chauna Banks-Daniel was disheartened to see nothing has changed in six months, and that quoted Councilwoman Donna Collins-Lewis as stating that the prison was "inhumane." Ryan Broussard, *Banks-Daniel wants to remove Prison Medical Services from EMS umbrella*, Greater Baton Rouge Business Report, February 25, 2016. On June 8, 2016, another article detailed the Health Management Associates Report's findings, including that only 36% of the prison's medical needs were being met. Andrea Gallo, *East Baton Rouge jail needs new medical leadership to fix 'inconsistent' health care, consultants say*, The Advocate, June 8, 2016.

Plaintiff maintains that his repeated requests and the continuous denials for access to this basic medical and hygienic needs, along with evidence that there were systemwide failures to provide healthcare demonstrates that there was a policy and practice of maintaining inadequate medical care at the Prison.

As defined by the Fifth Circuit, a "custom" is

[a] persistent, widespread practice of city officials or employees which, although not authorized by officially adopted and promulgated policy, is so common and

43

well settled as to constitute a custom that fairly represents municipal policy. Actual or constructive knowledge of such custom must be attributable to the governing body of the municipality or to an official to whom that body had delegated policy-making authority.

*Pineda v. City of Houston*, 291 F.3d 325, 328 (5th Cir. 2002).

Just as in *Duvall v. Dallas County, Texas*, the evidence shows that the Metropolitan Council knew of the poor medical care at the Prison and continued to house inmates there, that the Metropolitan Council was not willing to take the necessary steps to correct the lack of equipment or supplies, and that the measures taken were ineffective.[7] This evidence could lead a juror to draw the reasonable inference that the City/Parish created a custom or practice of inadequate access to medical care and basic hygienic supplies. Furthermore, based on the testimony of Ms. Stines and other medical staff, the Report and as detailed in the newspaper articles it is also reasonable to infer that the City/Parish through the Metropolitan Board had actual or constructive knowledge of the failure to provide sufficient access to medical care at the Prison.

C. *Plaintiff presents sufficient facts to create a genuine dispute that the official policy of inadequate access to healthcare and medical services led to the alleged constitutional harms.*

As to the third element, the City/Parish maintains that

there must be a direct causal link between the municipal policy and the constitutional deprivation. *Monell* describes the high threshold of proof by stating that the policy must be the "moving force" behind the violation. It follows, then that Mealey's claim that his Fourteenth Amendment Due Process rights had to have been violated by the "moving force" of the City/Parish's *de facto* policy of inaction. Here, a *de facto* policy of inaction is disproven by the affirmative steps taken in favor of reasonable accommodations for Mealey including shower chair purchases,

---

[7] As explained in footnote 6, *supra Monell* liability and a conditions of confinement claim significantly overlap. *Duvall*, 631 F.3d at 208 ("The jury found that Duvall's injury was caused by a policy or custom of the County. Although the jury found this fact in response to the court's instruction on municipal liability under the *Monell* test, the jury's finding satisfies the need for such a showing in connection with the underlying [conditions-of-confinement] constitutional violation as well. . . . We see no meaningful difference between these showings. . . . [W]e are convinced that the jury's finding of a custom or policy under the municipal-liability jury instruction satisfies the custom-or-policy element for purposes of the underlying constitutional violation.").

provision of medical care and supplies, and returning private property even after contraband was discovered within it.

(Doc. 122-3 at 9-10.)

In opposition, Plaintiff argues that the City/Parish's policy of providing inadequate access to medical care at the Prison was the moving force behind Mr. Mealey's constitutional deprivation. (Doc. 148 at 40-52.)

The Supreme Court has explained,

Once those officials who have the power to make official policy on a particular issue have been identified, it is for the jury to determine whether *their* decisions have caused the deprivation of rights at issue by policies which affirmatively command that it occur, or by acquiescence in a longstanding practice or custom which constitutes the "standard operating procedure" of the local governmental entity.

*Jett*, 491 U.S. at 737.

As discussed above, there are genuine disputes of material fact regarding whether City/Parish's policy of providing inadequate medical care and supplies was the moving force for Mealey's alleged constitutional violation. Specifically, whether the City/Parish's policy of inadequate medical care and supplies were the moving force that led to the lack of equipment and supplies, including requests for a wheelchair and a shower chair, catheters, lubrication and adult diapers, and for access to the infirmary shower. (Mealey Dep., Doc. 150-34 80:6-19; 185:21-186:10, 245:6-13; Mealey Aff., Doc. 150-25¶ 16.) Therefore, as the question of causation is a question of fact and genuine disputes of material fact exist, the Court will decline to grant summary judgment on this element. Therefore, the Court will DENY the City/Parish's *Motion for Summary Judgment* on the issue of the municipal liability under § 1983.

D. *Plaintiff has not presented sufficient facts to show that the Sheriff has an official policy or custom relating to inadequate access to medical care.*

The Sheriff argues:

> Plaintiff has not alleged and cannot point to an official policy or practice of Sheriff Gautreaux that resulted in the alleged deprivation of medical care, or a wheelchair or shower chair or medical supplies. It was Prison Medical Services who was responsible for providing medical care, medical supplies, and medical devices such as wheelchairs and shower chairs to the inmates at the Prison.

(Doc. 132-1 at 18-19.) Plaintiff asks the Court to look to the totality of the circumstances to infer that the Sheriff created an official policy or custom relating to inadequate access to medical care at the Prison because,

> the Sheriff has constructed a system where the Sheriff's office screens and rejects medical and disability-related grievances, trains the director of nursing on how to investigate and respond to inmate grievances, is personally involved in medical/disability related issues, and approves/disapproves of the transfer of inmates to better facilities.

(Doc. 150 at 30.) Plaintiff, moreover argues that the Sheriff "chose to house 1,700 inmates at a notably deficient facility that was understaffed, undertrained, and dangerously short on basic supplied and equipment." (Doc. 150 at 30.)

Plaintiff points to the fact that Corporal Patrick, who was employed by the Sheriff to process inmate grievances, rejected Mr. Mealey's grievances about his wheelchair and being on medical lockdown. (Cpl. Wayne Patrick Dep., Doc. 150-35 at 11:2-14; 14:2-25, 15:1-4.) Plaintiff also points to the fact that Warden Grimes trained Ms. Stines, who worked for Prison Medical Services on how to respond to inmate grievances that were medically based. (Stines Dep., Doc. 150-33 at 118:19-119:2.) Ms. Stines also rejected one of Mr. Mealey's grievances. These actions, Plaintiff argues, demonstrate that the Sheriff created a custom of ignoring the needs for medical care at the prison. Last, Plaintiff maintains that the Sheriff had the discretion to and should have transferred Mr. Mealey to a Department of Corrections facility. Tellingly, however, Plaintiff admits that if an inmate needed to be transferred because Prison Medical Services could not provide sufficient medical care, the transfer decision would be made by Prison Medical Services.

The Court does not agree with the Plaintiff. Although the evidence suggests that individual prison officials may have been deliberately indifferent to the serious risk of harm Mr. Mealey faced from the inadequate access to medical care, but in this case, Plaintiff has not shown that the practice of rejecting disabled inmates concerns regarding access to hygienic supplies or other medical care was "so common and well settled as to constitute a custom that fairly represents municipal policy." *Hicks-Fields*, 860 F.3d at 810–811.

For example, it is undisputed that when Warden Grimes was making rounds on the Q building and was informed by Mr. Mealey that he needed a shower chair with which to shower, Warden Grimes told Prison Medical Services that there was a need for shower chairs in the Q building. (Warden Grimes Dep., Doc. 150-40 at 10:15-25, 11:1-4.) At the time, Warden Grimes did not know whether there were shower chairs in the Infirmary or whether they were broken. (*Id.*) Warden Grimes passed the request on to Prison Medical Services because they supplied the shower chairs. (*Id.*) Further, there is evidence that some deputies would give Mr. Mealey trash bags to cover his wheelchair. (Doc. 150-3; Mealey Dep., Doc. 150-34 at 79:23-80:1.)

Plaintiff's evidence is not sufficient to show that there was an official policy or custom by the Sheriff of failing to provide adequate access to medical care to individuals with disabilities. Therefore, the Court will GRANT in part the Sheriff's *Motion for Summary Judgment* on the issue of liability pursuant to § 1983.

<u>CONCLUSION</u>

IT IS ORDERED that The City/Parish's *Motion for Summary Judgment* (Doc. 122) is DENIED. The Sheriff's *Motions for Summary Judgment* (Doc. 132 and Doc. 129) is GRANTED in part as to claim against the Sheriff pursuant to § 1983 in his official capacity and DENIED in

part as to the claim against the Sheriff in his official capacity pursuant to the ADA and the RA.

Signed in Baton Rouge, Louisiana, on January 31, 2020.

**JUDGE JOHN W. deGRAVELLES**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**